SANDOZ CHEMICAL WORKS *v.* UNITED STATES (No. 2628) [1]

1. FINDINGS OF FACT IN REAPPRAISEMENT REVIEW.

The findings of fact made by the Board of United States General Appraisers in reappraisement reviews have the force and effect of the verdict of a jury, and will not be disturbed if there is any substantial, competent evidence to support them. *Kuttroff, Pickhardt & Co.* v. *United States*, 13 Ct. Cust. Appls. 17, T. D. 40861.

2. AMERICAN SELLING PRICE—DOMESTIC COMPETITIVE ARTICLE—LIMITED MARKET.

Where it was shown that a domestic dyestuff, which would produce substantially the same results as the imported one, was freely offered for sale in the usual manner to all comers at a fair price, the finding of the Board of United States General Appraisers under section 402 (f), Tariff Act of 1922, that such price was the American selling price of a similar domestic competitive article was supported, notwithstanding that there were only two domestic manufacturers and only one prospective domestic buyer and no sales were made.

United States Court of Customs Appeals, February 2, 1926

APPEAL from Board of United States General Appraisers, G. A. 8981 (T. D. 40832)

[Affirmed.]

*Allan R. Brown* for appellant.

*Charles D. Lawrence*, Assistant Attorney General (*John G. Lerch*, special attorney, of counsel), for the United States.

*Marion De Vries* (*De Vries, Doherty, Davis & Lamb* of counsel) *amicus curiæ*.

[Oral argument December 14, 1925, by Mr. Brown, Mr. Lerch, and Mr. Doherty]

Before GRAHAM, Presiding Judge, and SMITH, BARBER, BLAND, and HATFIELD, Associate Judges

GRAHAM, Presiding Judge, delivered the opinion of the court:

This is an appeal from five judgments entered in reappraisement matters by the Board of General Appraisers. The subject matter and law involved in the several reappraisements are identical and they have, therefore, been consolidated and are heard together here. The case first came to this court as No. 2378. Thereafter, on February 17, 1925, this court reversed the judgment of the court below and remanded the cause for a statement of the facts upon which its findings were based, together with the reasons for such decision, as provided by section 501 of the Tariff Act of 1922. *Sandoz Chemical Works* v. *United States*, 12 Ct. Cust. Appls. 512. Thereafter, on April 21, 1925, the said board, in attempted compliance with the directions of this court, made and filed a decision containing certain findings of fact and reasons for its decision. That decision and the judgment entered thereon are now before us on appeal. By stipulation, the record in No. 2378 is considered as a part of the record in the case at bar.

[1] T. D. 41365.

The material imported was five shipments of a coal-tar product commonly known as pyrazolon, and was invoiced and entered as dichlor sulfo phenyl pyrazolon carboxylic acid, under paragraph 27 of the Tariff Act of 1922. It was claimed by importer that there was no similar competitive article manufactured in the United States and that, therefore, the American selling price could not be used in appraising this merchandise, and the United States value should be applied as provided in section 402 (d) of the said tariff act. Importer, after making additions in four cases and a subtraction in one case, to make value, fixed this United States value in its entries at $1.104 and $0.96 a pound, respectively. The local appraiser in each instance appraised the goods at $4 a pound, which he fixed as the American selling price thereof as provided by section 402 (f) of said act. The importer appealed in each instance and General Appraiser Brown, in each case found the value as entered. The Government thereafter applied to the Board of General Appraisers for a review of the judgments of said general appraiser, and upon a hearing the board reversed the same, sustaining the appraised value.

The record discloses that the material imported is a coal-tar intermediate, used in the preparation of dyes. It can be used in the manufacture of various dyes, and is claimed by the appellee to be a dyestuff 90 per centum complete. The chief use to which this pyrazolon was put by American manufacturers was in the manufacture of a dye known as "fast light yellow."

The issues in this case have been considerably narrowed since the matter first came to this court. In appellant's brief filed herein the following statement is made:

The case may be briefly summarized as follows: It is admitted that there is a domestic pyrazolon which accomplishes results substantially equal to those accomplished by the imported product when used in substantially the same manner. It is admitted that pyrazolon is not a finished dyestuff but is an intermediate useful only in producing a finished dyestuff. It is admitted that the domestic manufacturer of the finished dyestuff on whose testimony the Government relies, never sold a pound of his intermediate pyrazolon and never offered it to any actual user. The record shows, however, that the domestic manufacturer stated to certain of his friends and distributors that he was willing to sell the pyrazolon at $4 a pound, which is the appraised price, but it appears that these friends and distributors never made any attempt whatsoever to offer it to the trade. The domestic manufacturer furthermore admitted that the price of $4 was so high as to make it impossible for any prospective user to buy it and use it to make a finished dyestuff.

The issues therefore are, in substance, as follows:

1. Was there any finding of fact by the Board of General Appraisers that the American competitive article was freely offered for sale to all purchasers as is provided by section 402 (f) of the Tariff Act of 1922?

2. If there was such a finding of fact, is it supported by the record?

The many other errors assigned, not being argued here, we shall consider as waived by the appellant, and they will not be discussed in this opinion.

The court below, in its findings of fact, said:

Second. * * * the domestic article was freely offered for sale to all purchasers in the principal markets of the United States in the ordinary course of trade and in the usual wholesale quantities in such markets, or at the price that the manufacturer, producer, or owner would have received, or was willing to receive for such merchandise, when sold in the ordinary course of trade, and in the usual wholesale quantities. Such domestic product was produced and manufactured by the Pharma Chemical Corporation, which also produced, manufactured, and offered for sale on the same terms and conditions the finished dye of which the imported merchandise was the principal ingredient, but there was no actual sale or delivery of pyrazolon.

This finding of facts is criticized as being merely a reprint of a portion of section 402 (f) of the statute; that it, being a finding in alternative language, is, in fact, no finding at all, and that it is ambiguous and uncertain. Because of these things, appellant suggests that the cause should again be remanded for findings in compliance with the law.

In *Kuttroff, Pickhardt & Co.* v. *United States*, 13 Ct. Cust. Appls. 17, T. D. 40861, we outlined fully what such findings of fact under section 402 (f) should be. We there said that, it being first conceded or established that there was an American competitive article, then, to establish an American selling price, certain basic facts must be shown:

First. The price of goods and containers, and other costs ready for delivery.
Second. The price at which such article is freely offered for sale to all purchasers.
Third. The price in the principal market of the United States.
Fourth. The price in the ordinary course of trade.
Fifth. The price in the usual wholesale quantities.
Sixth. The price at time of exportation.
Or it may be established by the following alternative proof:
First. The price the owner, etc., would have received, or,
Second. The price the owner, etc., was willing to receive: (a) When sold in the ordinary course of trade. (b) When sold in the usual wholesale quantities. (c) At the time of exportation.

We further held that there must be findings of fact on one or both of the last-named alternatives by the board.

From a reading of the findings of fact now before us, we conclude there is a sufficient finding of fact upon the first alternative, namely: "That the American competitive article was freely offered for sale, within the meaning of said section 402 (f)." On the second alternative, namely, the price which the owner would have received or was willing to receive for the competitive American article, as provided in said section 402 (f), we do not believe the board's alternative finding of fact to be sufficient. The language is uncertain and

ambiguous and leaves us in doubt as to its exact scope and extent.
But there should be an end to this litigation.   We shall therefore
dispose of the matter upon the single issue presented by the first
finding of fact above suggested, that is, that the American competi-
tive product was freely offered for sale as provided for in said sec-
tion 402 (f).

It will first be observed that the findings of fact made by the court
below in such reappraisement matters have been held to have the
force and effect of the verdict of a jury.   The rule is well settled that
in such cases, if there is any substantial, competent evidence in the
record which supports the findings, they will not be disturbed.
*Kuttroff, Pickhardt & Co.* v. *United States, supra.*

Appellant insists that there is no evidence in the record which
shows that the American competitive product, pyrazolon, was ever
freely offered for sale to all purchasers in the principal markets of
the United States, in the ordinary course of trade and in the usual
wholesale quantities in such markets.

It is conceded in the argument here that the American competitive
product is a pyrazolon manufactured by the Pharma Chemical
Corporation.

A reading of the record discloses these facts: On behalf of appel-
lants, E. Gossweiler, its general sales manager, testified that he was
in touch with the chemical trade, and up to October 20, 1922, he
had never heard of any domestic pyrazolon being offered for sale,
but stated he had not made any inquiry respecting it.   William A.
Williamson, a wholesale chemical broker, specializing in dye inter-
mediates since September, 1914, testified that on October 1, 1922,
he made inquiry in the markets of the United States, of the Grasselli
Chemical Co., and of E. C. Klipstein Sons & Co., dealers in chemicals,
and could find no pyrazolon.   He also stated that on October 10,
1922, he made inquiry of Mr. W. H. Van Winckel, a broker, and
Van Winckel told him the Pharma Chemical Corporation was going
to make pyrazolon.   Van Winckel, called later by the Government,
stated he had no recollection of this conversation.

This completed the evidence on the part of the importer.

On the part of the Government, Mr. Albert J. Farmer, president of
the Pharma Chemical Corporation, testified.   He stated, in sub-
stance, that this company had been making pyrazolon in large com-
mercial quantities since May, 1922, that "there was never a time
from the beginning of our manufacture that we were not prepared to
sell the products," and that it could have made deliveries in com-
mercial quantities of 1,000 pounds or more at any time.   On the 2d
of August, 1922, the witness sent a letter to the Dye and Chemical
Section in the Treasury Department, informing that section that
the Pharma Chemical Corporation was prepared to sell pyrazolon

at $4 a pound and to make prompt deliveries at all times, which letter was duly received. Thereupon the product was duly listed by said section. At that time the importation of coal-tar dyes and dyestuffs was under the control of said section, pursuant to the authority of Title V, entitled the "Dye and chemical control act, 1921," of the emergency tariff act of May 27, 1921, which had been first extended by the act of August 24, 1921, and afterwards by the act approved November 16, 1921, and which was finally repealed by the Tariff Act of 1922. Said Title V provided, in part, as follows:

SEC. 501 (a) That on and after the day following the enactment of this act, for the period of three months, no sodium nitrite, no dyes or dyestuffs, including crudes and intermediates, no product or products derived directly or indirectly from coal tar (including crudes, intermediates, finished or partly finished products, and mixtures and compounds of such coal-tar products), and no synthetic organic drugs or synthetic organic chemicals, shall be admitted to entry or delivered from customs custody in the United States or in any of its possessions unless the Secretary determines that such article or a satisfactory substitute therefor is not obtainable in the United States or in any of its possessions in sufficient quantities and on reasonable terms as to quality, price, and delivery, and that such article in the quantity to be admitted is required for consumption by an actual consumer in the United States or in any of its possessions within six months after receipt of the merchandise.

In addition to this, in August, 1922, he personally advised the agents and distributors of the company in Boston and New York that the company was offering pyrazolon for sale; he also, at the same time, advised two or three chemical brokers of the same fact, naming in each instance $4 a pound as the price therefor. The sales manager of Pharma Chemical Corporation, also, was at the same time instructed to offer the product for sale to the trade. He also testified that as the results of these efforts, which he stated were the usual and ordinary efforts made by them to market their products, they had sold no pyrazolon, "*although we have advertised.*"

This testimony was corroborated by Leo R. Weber, department manager of Klipstein & Co., who testified that in the early part of August, 1922, Mr. Farmer told him he was ready to offer pyrazolon at $4 a pound to the trade; that the witness did not sell any nor did he offer any for sale to anyone, not knowing anyone at that time who he thought could use it; that he did not circularize his trade about it. W. H. Van Winckel, a sales broker, also stated that in August, 1922, Mr. Farmer offered him pyrazolon for sale at $4 a pound; that he did not offer it to anyone and had no requests for any. Mr. Frederick S. Dickson, assistant chief of the Division of Customs, in charge of the dye and chemical section of the Treasury Department, stated that the pyrazolon had been listed by him after receiving the letter from Mr. Farmer, and that it was the practice of his department at that time to inform any person inquiring for chemical products listed by him as to where they could be had and what their prices were.

In addition to this it is shown by the record that the only domestic competitor of the Pharma Chemical Corporation, at that time, in the manufacture of fast light yellow dye, and the only other prospective domestic buyer of pyrazolon, was the Cincinnati Chemical Works of Cincinnati, Ohio. It is shown also that the amount of this product usually sold at wholesale varies from 1,000 to 25,000 pounds.

The record shows the price at which the domestic pyrazolon was offered was $4 a pound. The testimony varies somewhat as regards the proportionate part of the cost of the completed fast light yellow dye which is represented by the pyrazolon. The witness Farmer gives this figure as 90 per centum, while the witness Ralph H. McKee, an analyst, gives it at "over three-fourths." The completed fast light yellow dye of the Pharma Chemical Corporation was selling at retail, on the market, at $3.25 per pound, less the usual discount for cash of 2 per centum, while it was being offered to a jobber, or broker, at $3 a pound, less 7½ and 2 per centum discounts. The record also discloses that 375 pounds of the domestic pyrazolon is sufficient to manufacture 600 pounds of the completed dye.

Without attempting, in any respect, to pass upon the weight of this testimony, we must conclude that there is substantial and competent evidence in the record to support the finding of the court below that the competitive American product, the Pharma Chemical Corporation's pyrazolon, was freely offered for sale to all purchasers in the principal markets of the United States, in the ordinary course of trade and in the usual wholesale quantities in such markets. The Pharma Chemical Corporation offered it for sale, not only in the principal markets, but throughout the United States, when it listed it and offered it to the general buying public through the proper governmental agency. It used its ordinary methods in offering the product for sale; the fact that its agents and distributors made no sales and no efforts to sell, not shown to be induced in any way by the manufacturer, does not seriously militate against this view. It is apparent that the market for such a product was extremely limited, in fact, confined to one buyer, the Cincinnati Chemical Co., a customer of the appellant. It will be noted the statute (sec. 402 [f]), does not require a sale of the product; it is sufficient if it be freely offered for sale.

But it is argued by appellant that the American competitive pyrazolon was not *freely* offered for sale, inasmuch as the price at which it was offered for sale was so high as to be prohibitive. If, as shown by the evidence, 375 pounds of the domestic pyrazolon will suffice for the manufacture of 600 pounds of fast light yellow dye, then, at $4 a pound, which was the selling price of this pyrazolon, it would require pyrazolon to the value of $2.50 to manufacture 1 pound of dye. If, also, this pyrazolon constitutes three-fourths of the expense of the

finished dye, a computation discloses the cost of such a completed dye would be $3.32; or, if it were 90 per centum, the completed dye would cost $2.77. As we have seen, the retail price of the Pharma Chemical Corporation's fast light yellow dye was $3.25 a pound, and the jobber's price $2.72 a pound.

We have said in *Kuttroff, Pickhardt & Co.* v. *United States*, 12 Ct. Cust. Appls. 299 (302):

> The American selling price and United States value is not the price at which domestic products are offered to a favored few in limited quantities in a market specially created or restricted for the purpose of fixing the duties to be assessed on importations, but it is the price at which such products are freely offered for sale to all comers in the usual wholesale quantities and in the principal markets established for such goods in the ordinary course of trade.

We may also add that, when it appears an arbitrary price has been set upon an American competitive product which is unreasonably high and has no just proportion to its cost of production, such a price will be subjected to close scrutiny by this court before being approved as the basis of an American selling price. But it should also be suggested, in this connection, that neither the law nor reason requires that the American producer shall fix such a selling price upon a coal-tar intermediate produced by him that his competitors may buy it upon the market, use it in the manufacture of a completed dye, and profitably undersell the completed product of this American producer, on the open market. All the law requires, in our opinion, is that the price of the raw material or partly manufactured substance, produced by the American manufacturer, shall bear a fair and reasonable proportion to the cost of the completed article to be made therefrom.

In the case before us, as we have seen, at the price fixed by the Pharma Chemical Corporation as the selling price of its pyrazolon, the completed dye could be produced at from $2.77 to $3.32 a pound. There is no considerable disparity between this and fast light yellow dye at $3.25 a pound retail or $2.72 a pound to the jobber. It does not seem to have been a fanciful or unreasonable price, but one very closely approximating its proportionate part of the cost of the finished dye.

We do not find any error in the record before us, and the judgment of the court below is *affirmed*.